| UNITED STATES DISTRICT COURT | USDC SDNY |
| SOUTHERN DISTRICT OF NEW YORK | DOCUMENT |
| | ELECTRONICALLY FILED |
| | DOC #: _____ |
| | DATE FILED: October 27, 2017 |

------------------------------------------------------------ X
:
THE 32BJ NORTH PENSION FUND and its :
BOARD OF TRUSTEES, :
 :
                            Plaintiffs, :
 : 15-cv-8680 (KBF)
                -v- :
 : OPINION & ORDER
NUTRITION MANAGEMENT SERVICES :
COMPANY, a/k/a NUTRITION :
MANAGEMENT SERVICES, INC., a/k/a :
NUTRITION MANAGEMENT SERVICES :
CORP., :
 :
                       Defendant. :
 :
------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

      This is an ERISA action seeking delinquent contributions due to the 32BJ North Pension Fund ("Pension Fund"). Plaintiffs' claims initially involved three audit periods, referred to as the First, Second, and Third Audit Periods. By Order dated February 13, 2017, the Court granted summary judgment as to the Second Audit Period. On May 26, 2017, the Court held a bench trial on the First and Third Audit Periods. The parties also made several post-trial filings. This matter was fully submitted as of August 15, 2017.

      At base, the dispute between the parties relates to what, if any, delinquent contributions remain to be paid on the First and Third Audits, and whether plaintiff is entitled to any interest and liquidated damages on those amounts. Defendant argues that a settlement was entered into between the parties that resolved all

amounts owed for the First Audit period, that such settlement did not include interest or liquidated damages, and that because plaintiff has improperly credited payments towards interest, it has incorrectly calculated what defendant has paid and what remains owing. For its part, plaintiff argues that the parties never entered into a settlement that resolved interest or liquidated damages on delinquent contributions, that the agreement that the parties reached was solely as to a payment plan, and that plaintiff never waived or compromised interest or liquidated damages. Therefore, plaintiff claims, its calculations as to amounts due and owing are correct.

The Court agrees with the plaintiff—the governing law and agreements provide for both interest and liquidated damages, and plaintiff never agreed to forego them. The Court also agrees that the payment plan for delinquent contributions was just that—a payment plan—and not a settlement agreement that resulted in an accord and satisfaction. From this, the Court determines that defendant continues to owe plaintiff certain amounts as delinquent contributions, interest, and liquidated damages.

The instant Opinion & Order constitutes the Court's findings of fact and conclusions of law.

I. FINDINGS OF FACT

The Court's findings of fact are made by a preponderance of the evidence.

A. <u>Witnesses and Documents</u>

Plaintiff's four witnesses testified live and by declaration: Violsa Perashi, Manager of the North Benefit Fund's billings and collection department, (ECF Nos. 55, 87, 91); Stuart Gritz, the Fund's outside auditor (ECF No. 67), Owen M. Rumelt (ECF No. 89), previously plaintiff's counsel, and Michael Fox, a payroll audit manager for the Fund's outside auditor (ECF No. 88). Plaintiff also introduced 19 documents, including the governing agreements, spreadsheets of payments, and communications between the parties. The defendant called one witness, the Chief Operating Officer of Nutrition Management, Kathleen A. Hill, (ECF No. 85-2, Hill Decl.), and introduced three documents, including its calculation of payments.

B. <u>Nutrition Management</u>

Nutrition Management provides comprehensive healthcare food service and facilities management to healthcare facilities. (Hill Decl. ¶ 2.) Until approximately April 2015, Hebrew Home of Westchester, in Valhalla, New York, was represented by Services Employees International Union, Local 32 BJ (the "Union" or "32BJ"). (<u>Id.</u>) The predecessor union to the 32BJ was the 32E. (<u>Id.</u> ¶ 3.) A collective bargaining agreement ("CBA") between the Union and Nutrition Management provided for pension contributions as described further below, and that are at issue in this case.

Nutrition Management experienced certain cash flow issues that resulted in delinquent pension plan contributions commencing in 2008.

3

C. <u>The Relevant Terms of the CBA and MOAs</u>

At all times pertinent to this action, defendant and the Union were parties to a collective bargaining agreement ("CBA") and memoranda of agreements ("MOAs"). The CBA had originally been entered into in 1998, by 32 BJ's predecessor, Local 32E. (PX 1.)

The CBA and MOAs provided that defendant make monthly contributions to the Pension Fund. (Hill Decl. ¶ 3.) Article 22 of the CBA set forth the monthly rate at which defendant was required to contribute to the Pension Fund for each eligible employee. (PX 1.) According to that provision, the defendant had to make contributions for each eligible employee covered thereunder. An employee had to have been employed for at least six months, and to work 22.5 hours per week, in order to trigger a contribution obligation. (<u>Id.</u>) To fulfill its obligations, the employer was obligated to provide the Union, on a monthly basis, the names of employees for which it was making payments. (<u>Id.</u>) The CBA further provides that "[t]he parties understand that the Local 32E Pension Fund will be held and managed under the terms and provisions of an Agreement and Declaration of Trust to be executed in connection with the said Fund, a copy of which is to be filed with the Employer and the Union." (<u>Id.</u>)

The MOAs (also part of PX 1), extended the duration of the CBA, but did not amend the basis upon which defendant was to make contributions (that is, once the employee had met the minimum employment duration and hours worked requirements). (PX 1, MOA ¶ 4.) Notably, in the MOA effective as of April 30,

4

2014, Nutrition agreed to make the required contributions and "the Employer hereby adopts and shall be bound by the Agreement and Declaration of Trust as it may be amended and the rules and regulations adopted or hereafter adopted by the Trustees of each Fund." (Id. ¶ 5.)

D. The Trust Agreement

In 2002, a group of employers and the Union entered into an Amended and Restated Agreement and Declaration of Trust (the "Agreement" or "Trust Agreement"). That Agreement was between certain predecessor entities and 32E, including the Bronx Realty Advisory Board, Inc., the Boiler Service Maintenance and Repair Employers Association of New York, associations composed of employers of building services employees (the "Associations") and Local 32B-32J, SEIU, AFL-CIO (defined as the "Union"). (PX 19.) This Agreement reflects that effective as of March 2001, Local 32E had been merged into Local 32B and Local 32J. (Id.) The Trust Agreement defines "Employer" as including "any employer in the building services industry that has or may hereafter have a Collective Bargaining Agreement in effect with the Union." (Id., Art. I, § 9.) The term "Collective Bargaining Agreement" is defined as an agreement entered into between one of the Employers and the Union. (Id. Art. I, § 6.)

The Trust Agreement provides that if contributions are not timely made, the "Trustees may take any action necessary to enforce payment." (Id. Art. VII, § 8.) The Agreement further provides that:

> An Employer that does not pay Contributions when due shall be obligated to pay, in addition to any penalties required under

5

any applicable Collective Bargaining Agreement or other contract, all of the following:

(a) the unpaid Contributions; and

(b) interest on the unpaid Contributions at such rate as the Trustee may fix from time to time or in particular cases; and

(c) an amount equal to the greater of – (i) interest on the unpaid Contributions at the rate specified in (b) above; or (ii) liquidated damages of twenty (20%) percent (or such higher percentage as the law allows) of the amount of unpaid Contributions; and

(d) reasonable fees and costs.

(Id.) There is no dispute that defendant had a copy of the Trust Agreement.

The Trust Agreement further provides for additional policies and rules to be promulgated from time to time. (Id. at 20) From time to time, the Trustees have in fact adopted a delinquency policy. Throughout the period in question, a "Delinquency Policy" was in effect. (PXs 3, 18.) A revised Policy was adopted on June 1, 2013. (PX 3.) Both policies provide for the collection of interest and liquidated damages.

The Policy provides that the Trustees have the right to establish a date on which contributions are due, the right to recover liquidated damages (PXs 3, 18, Art. 1, § 1.1(C)(5)), and the right to collect interest at the rate of 9% per annum on delinquent contributions (PX 3, Art. 2, § 2.1 (C)). The Policy further provides that "Delinquency Counsel" (acting on behalf of the Fund):

> [I]s authorized to enter into settlement negotiations, either orally or in writing, with delinquent employers. Delinquency Counsel . . . may not agree to any settlement which waives or

6

compromises the amount owed, including interest, liquidated damages, attorneys' fees or costs. Such settlements must be approved by the Board of Trustees.

(Id. at Art. 3, § 3.3.) In addition, § 3.5 provides:

<u>No Waiver of Interest, Liquidated Damages or Attorneys' Fees</u>

Unless the Trustees specifically agree to the contrary, no settlement may permanently waive the collection of interest, liquidated damages or attorneys' fees, although any settlement may suspend the collection of interest, liquidated damages, or attorneys' fees until a subsequent delinquency if the current collection of those amounts would involve unwarranted expense.

(Id., Art. 3, § 3.5.) Article 6 specifies that liquidated damages shall be calculated from the date the contributions were due and shall be the greater of interest on the delinquent contributions or 20% of them. (Id. Art. 6, § 6.1) The Policy also provides that settlements that are expected to occur over a period of time must be in writing and signed by the employer. (Id. Art. 3, § 3.7.)

When it filed its complaint in November 2015, plaintiff set forth its position on the Delinquency Policy. The case was litigated with interest or liquidated damages included in the claimed damages. Plaintiff's summary judgment briefing and pre-trial submissions were also clear that it sought interest and liquidated damages.

E. <u>The Audits</u>

Before the First Audit took place, Nutrition understood that it was delinquent in its pension plan contributions. Sometime in 2009, Kathleen A. Hill, President and COO for Nutrition, demonstrated appropriate concern with regard to

7

the delinquency and conscientiously began communicating with counsel for plaintiff, Owen Rumelt, to resolve the issue. (Hill Decl. ¶¶ 8–9.) As counsel for the Fund, Rumelt's responsibilities included attempting to get the defendant to pay delinquent contributions.

During early communications between Hill and Rumelt, Hill stated that Nutrition understood that it had an outstanding obligation, but that it was operating with cash constraints. (Id. ¶ 9.) At a meeting between Hill and Rumelt in New York in 2009 (which Rumelt does not specifically recall), plaintiff and Nutrition worked out the terms of a proposed payment plan. That initial plan, which was being implemented prior to a full audit (and thus prior to the time that the actual, full obligation was known), required payments by Nutrition of $5000 per month. (Id.)

During the first half of 2011, plaintiff conducted the First Audit that covered the period from January 1, 2008 to June 30, 2011. In August 2011, Stuart Gritz, in the audit department of 32BJ, provided defendant with the results of that audit—that delinquent contributions amounted to $260,540.01. (PX 20.) In addition, he notified defendant that plaintiff considered interest to be part of a total amount owed. (Id.) Gritz stated that in addition to the delinquent contributions, "Interest on unpaid North Fund contributions has accrued and has been assessed at a rate of 10% per annum as of the date that your contributions were due. The interest amount due to North Benefit Funds in $61,486.91." (Id.) The letter continued:

> As a result of your delinquency, consistent with Section 502(g)(2) of the Employee Retirement Income Security Act

8

> of 1974, as amended ("ERISA"), you may be liable for the unpaid North Fund contributions, interest on the unpaid contributions accrued from the date contributions were due at an annual rate of 10%, an amount equal to the greater of interest on the unpaid contributions or liquidated damages of up to 20% of the amount of the unpaid contributions.

(Id.)

Rumelt had a number of additional dealings with employees of the defendant, or its representative (Frank Beradelli) after the First Audit. There is no evidence that these discussions explicitly included discussion of interest or liquidated damages. Rather, it appears that the discussions generally concerned how Nutrition could pay what it owed to the Fund more generally.

Rumelt was clear and forthright and the Court credits his testimony. He testified that while he assisted in the facilitation of a payment plan, he never agreed to a formal settlement of all amounts due, inclusive of interest or liquidated damages. The Court is persuaded that he never had the authority to waive, or agreed to waive, the Fund's legal and contractual rights to such amounts.

Rumelt viewed the payment plan as a significant benefit to both plaintiff and defendant that did not require the forgiveness of interest or liquidated damages to provide adequate consideration. For plaintiff, the payment plan insured that the delinquent contributions would be paid, albeit late; for the defendant, it spread the burden of such payments over time. Rumelt had to seek approval from the Board of Trustees for any settlement, including spreading currently due obligations over

9

time.  He never sought, nor obtained, the Trustees' approval to waive or reduce interest or liquidated damages for Nutrition.

In contrast, Nutrition <u>did</u> believe that it had achieved a settlement of more than just the amounts owed as delinquent contributions.  Hill testified credibly that in February 2014, she believed the parties had reached agreement on a settlement of all outstanding amounts due.  (Hill Decl. ¶ 11.)  She maintains that she "expressly did not agree to pay any additional sums such as interest and/or penalties in connection without our agreement." (<u>Id.</u> ¶ 13.)

The Court finds that Nutrition was on notice of the provisions in the MOAs and Trust providing for interest and liquidated damages.  The CBA refers to the Trust, and the Trust refers to certain amendments, rules, and regulations.  The Court is not persuaded that just because Nutrition witnesses testified that they could not recall seeing the Trust that Nutrition had never read it.

The parties agreed that defendant would continue to make monthly payments of $5000, rising to $8000 per month in April 2014 and thereafter.  It was anticipated that this would occur in April 2015.  (<u>Id.</u> ¶ 11.)  Hill sent Rumelt an email confirming this agreement; her email did not include any reference to interest or liquidated damages.  Rumelt was clear that even as to the payment schedule, he would have to obtain the approval of the Trustees.  (<u>Id.</u>)  On February 6, 2014, Rumelt informed Beradelli that the Trustees had approved "a payment schedule." (DX 2.)

10

On April 28, 2014, Rumelt learned that defendant Nutrition was claiming that he had agreed to a settlement regarding the delinquent contributions for the First Audit. He wrote to Nutrition's agent, Beradelli, as follows:

> Ms. Hill is incorrect in stating that the parties had a settlement, let alone that said settlement was "in full resolution of all contributions due through January 31, 2012." All the parties have at this point is an interim agreed-upon payment schedule for amounts due and owing under the audit for the period of January 1, 2008 through June 30, 2011. Moreover, the Funds did not agree to any settlement of claims for contributions due after June 30, 2011. The Funds have never agreed to resolve a claim for contribution with *any* employer in the absence of any audit for the period for which the claim [is] being made.

(PX 9.) The Court credits Rumelt's testimony, consistent with what he stated in the February 2014 email confirming approval by the Trustees of a "payment plan," and his April 28, 2014 email to Beradelli, that what he agreed to, and had presented to the Trustees for approval, was an a payment schedule—and that he did not compromise any amounts relating to interest or liquidated damages.

Any confusion as to what each side intended to resolve through the payment plan could have been surfaced if only the parties had reduced their agreement to writing. They did not. Rumelt wanted to obtain a confession of judgment from the defendant, and set forth the payment schedule in a document. As Hill testified, she specifically instructed Beradelli to stall finalizing any such agreement, hoping to have the payments result in a "fait accompli." The Court believes that this strategy ultimately worked against defendant. The lack of a written agreement meant that the defendant deprived itself of clarity as to whether the payment plan included

11

resolution of only the delinquent contributions, or extended to all amounts due which included interest and liquidated damages.

There is some support for the notion that the payment plan constituted a full and final resolution of all moneys owed. Rumelt himself told Beradelli (for Nutrition) that compliance with the payment plan would result in the balance being paid off in "2.5 years." (DX 3.) That would only be so if it was assumed that interest and liquidated damages were <u>not</u> included. If they were, the payments would exceed the projected 2.5 years. But this evidence is swamped by the evidence that, as discussed below, the relevant agreements and governing ERISA law provide for interest and liquidated damages on delinquent contributions, and the parties never had a meeting of the minds to waive those provisions.

Defendant made the monthly contributions as agreed. (DX 1.) In May 2015, defendant had paid a total of $250,649.26. (PX 15.) Plaintiff credited payments made to amounts owed. This meant that the payments defendant was making were being credited to both delinquent contributions and assessed interest. (PX 16.) This, in turn, meant that at the end of two-and-a-half year period, defendant continued to owe <u>both</u> interest and delinquent contributions.

The Fund contends that a balance of delinquent contributions in the amount of $72,991.06 remains outstanding; it also contends that additional interest is owed in the amount of $49,668.43.[1] (PX 16; Plaintiff's Post-Trial Brief ("Pl.'s Br."), 24.)

---

[1] As of August 31, 2017.

In addition, the Fund has asserted that it is also owed liquidated damages in the amount of $49,668.43, for a total of $172,327.92 for the First Audit. (Pl.'s Br. at 24.)

While issues remained to be resolved for the First Audit, plaintiff conducted two additional audits (the Second and Third Audits). The Second Audit covered the period from July 1, 2011 to May 31, 2013. That audit found a delinquency, but no triable issue as to that audit was presented and this Opinion & Order therefore does not address it. (ECF No. 70 at 4.)

The Third Audit covered the period from June 1, 2013 to April 30, 2015. That audit found a delinquency of $10,219.70, plus interest in the amount of $3,010.03 and liquidated damages in the amount of $3,010.03, for a claimed total of $16,239.76. (Pl's Br. at 24.)

II. CONCLUSIONS OF LAW

Section 515 of ERISA provides that:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Section 502(g)(2) of ERISA—in effect at all relevant times—provides for damages assessed against an employer who has been delinquent in making required contributions. 29 U.S.C. § 1132. That provision provides that a fund may recover:

> (A) the unpaid contributions, (B) interest on the unpaid contributions, (C) an amount equal to the greater of-- (i)

13

>interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan.

29 U.S.C. § 1132(g)(2), § 502(g)(2).

The principle issues raised in this case arise from the dispute between the parties as to whether interest and liquidated damages are properly recoverable by plaintiff. Defendant asserts that any interest and liquidated damages were part of the settlement that was reached in February 2014 and that resulted in payments through April 2015. If they were not included in any settlement, then the manner in which the plaintiff credited the monthly $5000 or $8000 payments by Nutrition was correct, and there remains an outstanding balance.

The law is clear that interest and liquidated damages are recoverable under 29 U.S.C. § 1132(g)(2), § 502(g)(2). Defendant has argued that the Trust Agreement and Delinquency Policies are not part of the "plan" as referenced in § 502(g) and that, therefore, it cannot be bound by the provisions within. This is incorrect. The Second Circuit consistently applies delinquency policies as the "plan" for purposes of calculating interest and liquidated damages rates. See Iron Workers Dist. Council v. Hudson Steel Fabricators & Erectors, Inc., 68 F.3d 1502, 1508 (2d Cir. 1995) (calculating damages under the Collections Policy); Trs. of the New York City Dist. Council of Carpenters Pension Fund v. Installations of Am., Inc., No. 15-cv-8316, 2017 WL 384694, at *4 (S.D.N.Y. Jan. 26, 2017) (calculating prejudgment interest based upon a "Policy" for collection of Employer Contributions); see also Health & Welfare Fund of the United Food & Commercial Workers Local 2013 v. Precision Abstract, LLC, No. 16-cv-4690, 2017 WL 4325713 (E.D.N.Y. May 19, 2017)

(calculating interest on unpaid contributions according to the terms of the Collection Policy).

Even if the Delinquency Policy was not considered part of the plan, it would nevertheless be binding upon defendant. The CBA itself specifically references the Trust Agreement, stating that the Fund "will be held and managed under the terms and provisions of an Agreement and Declaration of Trust." (PX 1, Art. 22.) The Agreement in turn references the Policy.

Moreover, as discussed above, defendant was on notice that interest and liquidated damages would be recoverable in the event of delinquency. Notice was provided by the terms of the Trust Agreement, as was provided in the Delinquency Policy. In addition, the first formal letter setting forth the deficiency noted by the First Audit, from the Fund's outside auditor, Gritz, specifically noted the inclusion of an incremental payment for interest, and referenced liquidated damages.

Defendant finally argues that in any event, it reached a settlement with the plaintiff in February 2014 that constituted a full and final resolution of any amounts owed for the delinquency. Defendant bears the burden of proof on this issue and has failed to carry its burden. Consol. Edison Co. v. Jet Asphalt Corp., 522 N.Y.S. 2d 124, 129 (App. Div. 1987). In short, defendant cannot meet the first and essential element of this defense: an accord, or agreement to compromise interest or liquidated damages. Id. The Trust Agreement and Delinquency Policy in place prior to 2013, the Gritz letter, and the text of § 502 itself, all make clear that interest and liquidated damages are part of what defendant owed to plaintiff.

15

Under these circumstances, only a meeting of the minds, an agreement, which plaintiff and defendant did not have, could serve to compromise those amounts.

Thus, while the parties had a meeting of the minds as to the amount of contributions owed, there was no meeting of the minds with regard to liquidated damages and interest. Even if there had been a meeting of the minds between Rumelt and one of Hill or Beradelli, this would only have been the first step in achieving a binding compromise. As both the Trust Agreement and Policy stated, Rumelt would have had to bring any agreement to the Trustees for approval. Rumelt communicated this to Beradelli in the email exchange in February 2014. Rumelt never sought nor obtained the Trustees' approval of any agreement relating to interest or liquidated damages.

III. CONCLUSION

As set forth above, the Court finds that plaintiff has demonstrated its entitlement to delinquent contributions in the amount of $83,210.76 and to interest and liquidated damages. As interest has increased since the date of the trial and

when the last set of calculations were provided to the Court, the parties are directed to confer on a form of judgment reflecting the Court's decision, and to provide a proposed form of judgment to the Court within one week from the date of this Opinion & Order.

SO ORDERED.

Dated:    New York, New York
             October 27, 2017

                                              KATHERINE B. FORREST
                                              United States District Judge